## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MATHEW CAUGHEY, on behalf of himself and all others similarly situated, | No. 23-cv-264 |
| | CLASS ACTION |
|     Plaintiff, | |
| v. | |
| BRIDGECREST ACCEPTANCE CORPORATION, and BRIDGECREST CREDIT COMPANY, LLC | |
|     Defendants. | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Mathew Caughey ("Plaintiff" or "Caughey") brings this class action complaint against Bridgecrest Acceptance Corporation and Bridgecrest Credit Company, LLC ("Defendants") on behalf of himself and the class set forth below.

## SUMMARY OF THE ACTION

1.      This is an action against Defendants for charging and collecting from Pennsylvania consumers illegal "pay-to-pay" fees and interest, in violation of Chapter 62 of Pennsylvania's Consumer Credit Code ("CCC"), 12 Pa. C.S. §§ 6201 *et seq*.[1]

2.      Caughey and many other Pennsylvanians have lost money because of Defendants' unlawful conduct.

3.      Caughey, on behalf of himself and a Pennsylvania class, seeks to recover damages, attorneys' fees and costs, and all other relief available under Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL") and Loan Interest and Protection Law ("LIPL"), or, alternatively, restitution for Defendants' overcharges.

---

[1] The CCC was formerly the Motor Vehicle Sales Finance Act ("MVSFA"), 69 P.S. §§ 601 *et seq*.

## PARTIES

4.      Caughey is a natural person over the age of eighteen.

5.      Caughey resides in Lawrence County, Pennsylvania.

6.      Bridgecrest Acceptance is an Arizona corporation headquartered in Arizona.

7.      Bridgecrest Acceptance is licensed under the CCC as a sales finance company.

8.      Bridgecrest Credit is an Arizona corporation headquartered in Arizona.[2]

9.      Bridgecrest Credit is licensed under the CCC as a collector repossessor.

10.     As licensees, Defendants are subject to the CCC. 12 Pa. C.S. § 6211(a).

## APPLICABLE LAW

11.     CCC licensees may impose "finance charges." 12 Pa. C.S. §§ 6233(a), 6243(a).

12.     For new motor vehicles and used motor vehicles that are less than two years old, the "finance charge" a CCC licensee may charge, collect, contract for, or receive is capped at 18% simple interest per year. 12 Pa. C.S. §§ 6243(d)(1), (e)(1).

13.     For used motor vehicles that are over two years old, the "finance charge" a CCC licensee may charge, collect, contract for, or receive is capped at 21% simple interest per year. 12 Pa. C.S. § 6243(e)(2).

14.     Although CCC licensees may impose "finance charges," they may not impose "pay-to-pay" fees (*i.e.*, fees that companies charge consumers to process payments).

15.     Under § 6233(a) of the CCC, licensees "may directly or indirectly charge, contract for, collect or receive from the buyer, in connection with the retail sale of a motor vehicle under an installment sale contract, insurance charges, other charges necessary or incidental to the sale of

---

[2] In its notice of removal, Bridgecrest Acceptance contended that Brigdecrest Credit was the proper party. (Doc. 1, p. 1 n.1.)

the motor vehicle, finance charges, refinance charges, late charges, recording and satisfaction fees, court costs, attorney fees and costs of retaking, repairing and storing a repossessed motor vehicle[.]" 12 Pa. C.S. § 6233(a).

16.    "Pay-to-pay" fees, do not qualify as permitted charges under § 6233(a).

17.    Specifically, "pay-to-pay" fees do not qualify as insurance charges, other charges necessary or incidental to the sale of the motor vehicle, finance charges, refinance charges, late charges, recording and satisfaction fees, court costs, attorney fees, or costs of retaking, repairing, or storing a repossessed motor vehicle. *See* 12 Pa. C.S. §§ 6241, 6242, 6243, 6244, 6245, 6256, 6261.

18.    Since "pay-to-pay" fees are not permitted under § 6233(a) of the CCC, such fees are prohibited by § 6233(b) and, consequently, are illegal. *See* 12 Pa. C.S. § 6233(b) ("A licensee may not directly or indirectly charge, contract for, collect or receive from the buyer, in connection with the retail sale of a motor vehicle under an installment sale contract, any further or other amount for costs, charges, examination, appraisal, service, brokerage, commission, expense, interest, discount, fees, fines, penalties or other thing of value in excess of the amounts permitted under [§ 6233(a).]").

## **FACTUAL ALLEGATIONS RELATING TO PLAINTIFF**

19.    On April 25, 2019, Caughey purchased a used Ford Escape (the "Vehicle").

20.    Caughey bought the Vehicle primarily for personal, family, or household purposes.

21.    Caughey obtained financing for the Vehicle pursuant to a written Retail Installment Contract and Security Agreement ("RISC"). (*See* Exhibit A.)

22.    The RISC included a $15,278.43 amount financed and a $13,230.69 finance charge, both of which were to be repaid over a 72-month period.

23.     The finance charge yielded a 23.28% APR.

24.     After buying the Vehicle, Caughey began making payments to Defendants.

25.     Caughey made at least 12 payments to Defendants by phone using a debit card.

26.     Caughey made these payments on: May 18, 2019; June 17, 2019; July 31, 2019; September 6, 2019; October 4, 2019; November 1, 2019; December 27, 2019; January 10, 2020; February 7, 2020; February 21, 2020; May 1, 2020; and May 15, 2020.

27.     Defendants charged a $3.95 "money transfer fee" for each payment.

28.     Defendants also charged Caughey interest at a rate of 23.28%.

29.     As described herein, the "money transfer fees" and similar "pay-to-pay" fees, along with 23.28% interest charges, are illegal under Pennsylvania law.

30.     Defendants knew or should have known it was impermissible to charge, collect, contract for, or receive these fees and charges from Caughey.

31.     As a matter of policy or practice, Defendants regularly charge, collect, contract for, or receive "pay-to-pay" fees and excessive interest charges from Pennsylvania purchasers, despite that the fact that these fees and charges are illegal under Pennsylvania law.

32.     As a result of this conduct, Caughey and many Pennsylvanians lost money.

33.     Indeed, Caughey and many Pennsylvanians paid unlawful charges and were denied the use of the money that was used to pay those charges.

34.     Further, Caughey and other Pennsylvanians that refinanced their loans paid more for their refinanced loans as a result of Defendants' conduct.

35.     For example, when Caughey refinanced his loan, his outstanding loan balance was $14,878.56, but that balance would have been at least $400 or $500 dollars less if Defendants had not charged Caughey unlawful amounts. (*See* Exhibit B.)

36.     Because of that, the balance of Caughey's refinanced loan was higher than it would have been, which meant Caughey's monthly payments were higher than they would have been and Caughey was required to pay more interest that he otherwise should have paid on his refinanced loan as a result of Defendants' conduct.

## CLASS ACTION ALLEGATIONS

37.     Caughey brings this action on behalf of himself and all others similarly situated under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

38.     Caughey seeks to certify the following classes:

***The "Pay-To-Pay" Fee Class***

"All Pennsylvania residents who, within the applicable statute of limitations, paid a 'money transfer fee' or similar fee on an installment payment due to Defendant."

***The Interest Overcharge Class***

"All Pennsylvania residents who, within the applicable statute of limitations, paid an interest charge above 18% on an installment payment due to Defendant on a new motor vehicle, paid an interest charge above 18% on an installment payment due to Defendant on a used motor vehicle that was less than two years old, and/or paid an interest charge above 21% on an installment payment due to Defendant on a used motor vehicle that was over two years old."

39.     Caughey reserves the right to expand, narrow, or otherwise modify the classes as litigation continues and discovery proceeds.

40.     Fed. R. Civ. P. 23(a)(1): The classes are so numerous that joinder of all members is impracticable. There likely are hundreds of members of the classes. Since each of the claims of the class members is substantially identical, and the class members request substantially similar relief, centralizing the class members' claims in a single proceeding is the most manageable litigation method available.

41.     <u>Fed. R. Civ. P. 23(a)(2):</u> Caughey and the class members share numerous common questions of law and fact that will drive the resolution of the litigation and predominate over any individual issues. For example, there is a single common answer to the question of whether Defendants could charge, collect, contract for, or receive "money transfer fees" or similar fees. Similarly, there is a single common answer to the question of whether Defendants could charge, collect, contract for, or receive interest charges that exceed the limits set forth in the CCC. These questions, and other common questions of law and fact, predominate over any individual issues particular to the members of the classes.

42.     <u>Fed. R. Civ. P. 23(a)(3):</u> Caughey's claims are typical of the claims of the classes because the claims of Caughey and the classes are based on the same legal theories and arise from the same conduct.

43.     <u>Fed R. Civ. P. 23(a)(4):</u> Caughey is an adequate representative of the classes because the interests of Caughey and the class members align. Caughey will fairly, adequately, and vigorously represent and protect the interests of the classes and has no interest antagonistic to the classes. Caughey retained counsel who are competent and experienced in the prosecution of class action litigation generally and consumer finance litigation specifically.

44.     <u>Fed. R. Civ. P. 23(b)(3):</u> Given the complexity and nature of the issues presented and the relief requested, the expense and time necessary to obtain such relief, and the anticipated recovery and relief available, the class action mechanism is by far the preferred and most efficient litigation mechanism. Additionally, requiring Caughey and the class members to file individual actions would impose a crushing burden on the court system and almost certainly lead to inconsistent judgments. Class treatment presents far fewer management difficulties and provides benefits of a single adjudication and economies of scale.

<u>**COUNT I**</u>
**Violation of the Unfair Trade Practices and Consumer Protection Law**
**73 P.S. §§ 201-1 *et seq.***
***On behalf of Caughey and the classes***

45.     Caughey, the members of the classes, and Defendants are "persons" under 73 P.S. § 201-2(2).

46.     Caughey and the members of the classes purchased goods or services in "trade" or "commerce" under 73 P.S. § 201-2(3).

47.     Caughey and the class members purchased goods or services primarily for personal, family, or household purposes under 73 P.S. § 201-9.2(a).

48.     Defendants engaged in "unfair methods of competition" or "unfair or deceptive acts or practices" under 73 P.S. § 201-2(4) by engaging in fraudulent or deceptive conduct which created a likelihood of confusion or misunderstanding. 73 P.S. § 201-2(4)(xxi).

49.     For example, and without limitation, Defendants represented that the interest, fees, and other charges that Caughey and the class members paid were enforceable, even though those terms were not enforceable. *See* 12 Pa. C.S. § 6233(e).

50.     Defendants' unfair methods of competition and unfair or deceptive acts or practices are declared unlawful by 73 P.S. § 201-3(a).

51.     Caughey and the class members lost money or property as a result of Defendants' illegal conduct and, therefore, are entitled to $100 for each payment in which Bridgecrest charged a "pay-to-pay" fee, or three times the amount of each fee Bridgecrest charged, whichever is greater, $100 for each payment in which Bridgecrest charged excessive interest, or three times the amount of each excess charge, whichever is greater, actual damages, statutory damages, treble damages, and all other available relief under 73 P.S. § 201-9.2(a), as well as costs and reasonable attorneys' fees, and such additional relief the Court deems necessary or proper.

7

## COUNT II
### Violation of the Loan Interest and Protection Law
### 41 P.S. §§ 101 *et seq.*
### *On behalf of Caughey and the classes*

52.     Caughey, the class members, and Defendants are "persons" under the LIPL. 41 P.S. § 502.

53.     The LIPL authorizes a "person who has paid a rate of interest for the loan or use of money at a rate in excess of that provided for by this act or otherwise by law or has paid charges prohibited or in excess of those allowed by this act or otherwise by law [to] recover triple the amount of such excess interest or charges in a suit at law against the person who has collected such excess interest or charges." *Id.*

54.     Caughey and the class members paid interest and charges in excess of those allowed by the CCC, which means they paid interest and charges in excess of those otherwise permitted by law and, therefore, are entitled to recover under the LIPL.

55.     Defendant may contend that the financing transactions at issue in this case are not subject to the LIPL because the financing of goods on credit was not considered to be "subject to the prohibition of usury or to regulations applicable to banking and loan transactions." *Equitable Credit & Discount Co. v. Geier*, 21 A.2d 53, 58 (Pa. 1941).

56.     The Court should reject this claim because the legislature subjected motor vehicle financing transactions to usury prohibitions and banking and loan regulation in 1947 by enacting the MVSFA, which is now Chapter 62 of the CCC. *In re Stewart*, 93 B.R. 878, 887 (Bankr. E.D. Pa. 1988) (citing *Skolnick v. Ford Motor Credit. Co.*, 465 A.2d 1064, 1067 n.5 (Pa. Super. 1983)) ("[The LIPL] applies in case[s] challenging overcharges of finance charges in motor vehicle sales financing transaction[s]."); *see also Equipment Finance, Inc. v. Grannas*, 218 A.2d 81, 84 (Pa. Super. Ct. 1966).

57.     For example, motor vehicle financing transactions are clearly subject to banking regulation since licenses are required to engage in such transactions, and since the Department of Banking has oversight over such transactions. *See* 12 Pa. C.S. §§ 6203, 6211.

58.     Similarly, motor vehicle financing transactions are subject to usury prohibitions, as Chapter 62 of the CCC caps the maximum rate of interest between 18% to 21% "simple interest" per year. *See* 12 Pa. C.S. §§ 6243(d), 6243(e).

59.     Moreover, motor vehicle financing transactions are no longer considered to involve the sale of goods on credit, as Chapter 63 of the CCC exclusively regulates such transactions, and specifically exempts motor vehicle financing transactions from its scope. *See* 12 Pa. C.S. §§ 6302, 6304(e)

60.     On top of that, modern motor vehicle financing transactions are structured as loans, as they involve application of simple interest to unpaid loan balances, rather than a fixed finance charge added to a good's sale price. *See Melnicoff v. Huber Inv. Co.*, 12 Pa. D. & C. 405, 407 (C.P. Phila. 1929) ("[U]sury cannot be predicated upon the fact that property is sold on credit and at an advance of price over what would be charged in the case of a cash sale so long as it appears that the price charged is in fact fixed for the purchase of goods on credit[.]").

61.     Modern motor vehicle financing transactions also are closer to loans than the sale of goods on credit because they involve third parties that finance the transaction, and that buy the loan after it is issued (this generally occurs in the forum of securitization or a finance company). Robert J. Banta, *Negotiability in Consumer Sales: The Need for Further Study*, 53 Neb. L. Rev. 195, 195 (1974) (discussing this arrangement and stating that, "[i]n substance, what this amounts to is an indirect loan transaction").

62.     In short, because the transactions at issue involved the payment of interest and fees that were not permitted by the CCC, Caughey and the class members are entitled to recover under the LIPL. *See In re Stewart*, 93 B.R. at 887 ("[The LIPL] expressly applies to any 'loan or *use of money*' which is 'provided for by this act *or otherwise by law*.'"); *Skolnick*, 465 A.2d at 1067 n.5 ("The phrase 'otherwise by law' authorizes the legislature, through the provisions of other Acts of General Assembly, to set a particular interest rate for that legislation only. Indeed, this was done through the MVSFA where financing for four classes of motor vehicles was computed with the application of different interest rates.").

63.     Accordingly, Caughey and the class members are entitled to triple the amount of excess interest and charges that they paid, reasonable attorney's fees, costs, and expenses, and such additional relief the Court deems necessary or proper. 41 P.S. §§ 502, 503.

<u>**COUNT III**</u>
**Unjust Enrichment**
***On behalf of Caughey and the classes***

64.     Caughey and the class members conferred monetary benefits on Bridgecrest by paying "money transfer fees" and excess interest when making payments to Bridgecrest.

65.     Bridgecrest appreciated, accepted, and retained monetary benefits by requiring the class members and Caughey to pay "money transfer fees" and excess interest.

66.     It would be inequitable for Bridgecrest to retain these benefits, as Bridgecrest could not legally require Caughey or the class members to pay "money transfer fees" or excess interest.

67.     Accordingly, Caughey and the class members request restitution in the form of all excess interest, "money transfer fees," and any other "pay-to-pay" fees that Caughey or any class member were required to pay when making payments to Bridgecrest, along with attorneys' fees, costs, and such additional relief the Court deems necessary or proper.

## JURY TRIAL DEMANDED

Caughey requests a jury trial on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Caughey, on behalf of himself and all others similarly situated, requests that the Court enter judgment against Bridgecrest, including an order:

A.   Determining that this matter may proceed as a class action, certifying the classes asserted herein, appointing Caughey as the class representative, and appointing Caughey's counsel as class counsel;

B.   Declaring Bridgecrest's conduct unlawful;

C.   Awarding Caughey and the classes actual, compensatory, consequential, statutory, treble, and all other damages available under the law;

D.   Awarding Caughey and the class members restitution;

E.   Awarding attorneys' fees, costs, and expenses, as provided by law or equity;

F.   Awarding pre- and post-judgment interest, as provided by law or equity; and

G.   Awarding all other relief that is just, equitable, and appropriate, as the Court may allow.

Respectfully submitted,

Dated: June 17, 2024                    By:   */s/ Kevin Abramowicz*
                                              Kevin Abramowicz
                                              Kevin Tucker
                                              Chandler Steiger
                                              Stephanie Moore
                                              **East End Trial Group LLC**
                                              6901 Lynn Way, Suite 215
                                              Pittsburgh, PA 15208
                                              Tel: (412) 223-5740
                                              Fax: (412) 626-7101
                                              kabramowicz@eastendtrialgroup.com
                                              ktucker@eastendtrialgroup.com
                                              csteiger@eastendtrialgroup.com
                                              smoore@eastendtrialgroup.com

                                              *Attorneys for Plaintiff*